UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| **ASMA SNYDER,** <br><br> Plaintiff, <br><br> v. <br><br> **HENDRICK AUTOMOTIVE GROUP, LLC, d/b/a HENDRICK LEXUS KANSAS CITY,** <br> Serve Registered Agent: <br> Corporation Service Co. <br> 1100 SW Wanamaker Rd., Ste. 103 <br> Topeka, KS 66604 <br><br> **HENDRICK CORPORATION, LLC,** <br> Serve Registered Agent: <br> Corporation Service Co. <br> 1100 SW Wanamaker Rd., Ste. 103 <br> Topeka, KS 66604 <br><br> Defendants. | Case No. 2:23-cv-02564 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Asma Snyder, by and through the undersigned counsel, and for her Complaint against Defendants Hendrick Automotive Group, LLC d/b/a Hendrick Lexus Kansas City and Hendrick Corporation, LLC, states and avers to the Court as follows:

## TYPE OF ACTION

1. This is an action for compensatory and punitive damages arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Kansas Act Against Discrimination, K.S.A. § 44-1001, et seq. ("KAAD").

## PARTIES

2. Plaintiff resides in Lenexa, Johnson County, Kansas.

3. At all times mentioned herein, Defendant Hendrick Automotive Group, LLC d/b/a Hendrick Lexus Kansas City was a Kansas limited liability company, registered to do business in the State of Kansas, employed at least fifteen (15) employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and was an "employer" within the meaning of Title VII and the KAAD.

4. Defendant Hendrick Automotive Group, LLC's mailing address is 6000 Monroe Road, Charlotte, NC 28212.

5. Defendant Hendrick Automotive Group, LLC was responsible for establishing policies and training employees concerning discrimination, harassment, and retaliation.

6. Defendant Hendrick Automotive Group, LLC was responsible for receiving, investigating, and responding to complaints of discrimination, harassment, and retaliation.

7. Defendant Hendrick Automotive Group, LLC had the power to discipline employees who may have failed to comply with policies against discrimination, harassment, and retaliation.

8. At all times mentioned herein, Defendant Hendrick Corporation, LLC was a Kansas limited liability company, registered to do business in the State of Kansas, employed at least fifteen (15) employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and was an "employer" within the meaning of Title VII and the KAAD.

9. Defendant Hendrick Corporation, LLC's mailing address is 6000 Monroe Road, Charlotte, NC 28212.

10. Upon information and belief, Defendant Hendrick Corporation, LLC owned, managed, operated, and/or provided support services to Defendant Hendrick Automotive Group, LLC.

11. Upon information and belief, Defendant Hendrick Corporation, LLC was responsible for establishing policies and training employees concerning discrimination, harassment, and retaliation.

12. Upon information and belief, Defendant Hendrick Corporation, LLC was responsible for receiving, investigating, and responding to complaints of discrimination, harassment, and retaliation.

13. Upon information and belief, Defendant Hendrick Corporation, LLC had the power to discipline employees who may have failed to comply with policies against discrimination, harassment, and retaliation.

14. Defendants Hendrick Automotive Group, LLC and Hendrick Corporation, LLC will hereinafter collectively be referred to as "Hendrick."

15. At all times mentioned herein, the perpetrators described in this Complaint were agents, servants, and employees of Defendants and were at all such times acting within the scope and course of their agency and employment or were acting as a "proxy" or "alter-ego," and/or the actions were expressly authorized by Defendants and/or their actions were ratified by Defendants, thus making Defendants liable for said actions under the doctrine of respondeat superior.

## JURISDICTION AND VENUE

16. This Court has jurisdiction of these employment discrimination claims, and venue properly lies in this judicial district pursuant to 28 U.S.C. § 1331, 28 U.S.C. 1391, and 42 U.S.C. § 2000e-5(f)(3).

17. Plaintiff seeks damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

18. On May 10, 2022, Plaintiff timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the acts complained of herein alleging that Defendant subjected her to discrimination, harassment, and retaliation. A copy is attached hereto and incorporated herein as Exhibit A.

19. On September 28, 2023, Plaintiff received a Notice of Right to Sue from the EEOC. A copy is attached hereto and incorporated herein as Exhibit B.

20. Plaintiff filed this action within ninety (90) days of receipt of the Notice of Right to Sue from the EEOC.

21. Plaintiff has properly exhausted all administrative remedies.

**ALLEGATIONS COMMON TO ALL COUNTS**

22. Plaintiff was born in Kuwait.

23. Plaintiff is female.

24. English is not Plaintiff's first language, and she has an accent.

25. Plaintiff is Muslim.

26. In or about January 2020, Plaintiff began her employment with Hendrick at its Lexus dealership at 6935 Frontage Road, Merriam, KS 66203 ("Hendrick Lexus") in a Sales Consultant position.

27. Throughout Plaintiff's employment at Hendrick, Plaintiff's co-workers mocked her accent and said co-workers and other co-workers laughed.

28. In or about February or March 2020, a new Sales Manager, Chetan Sampat, began working at Hendrick Lexus.

29. Mr. Sampat told Plaintiff that he would train her.

30. Mr. Sampat told Plaintiff that he would make her successful.

31. Mr. Sampat made sexual advances toward Plaintiff.

32. On one occasion, Mr. Sampat asked Plaintiff to go to her house and smoke hookah.

33. Plaintiff first declined Mr. Sampat's proposal.

34. After Mr. Sampat asked again, Plaintiff suggested that they go to a hookah bar and that she bring a friend.

35. Mr. Sampat, Plaintiff, another female co-worker, and that female co-worker's boyfriend went and smoked hookah at an establishment.

36. On another occasion, Mr. Sampat again asked Plaintiff to go to her house and smoke hookah.

37. Plaintiff initially told Mr. Sampat that she could not go because she was busy.

38. Mr. Sampat asked Plaintiff again to go smoke hookah at her house.

39. Plaintiff told Mr. Sampat that she wanted to maintain a casual friendly coworker relationship and invited him to play tennis.

40. Plaintiff asked Mr. Sampat to invite his wife.

41. Mr. Sampat agreed at first but then cancelled and said he did not play tennis.

42. In or about May 2020, Mr. Sampat asked Plaintiff when she was going to invite him to her house to smoke hookah.

43. Plaintiff indicated to Mr. Sampat that she could not.

44. Mr. Sampat told Plaintiff not to address any issue that she might have with him to any other manager and address it to him only.

45. Shortly thereafter, Plaintiff reported to General Manager, Nick Karras, that Mr. Sampat had asked to go to her house and smoke hookah with her many times and that she perceived these comments by Mr. Sampat as sexual advances towards her.

46. Upon information and belief, Mr. Sampat was made aware of the fact that Plaintiff had made a report against him.

47. As a Sales Consultant at Hendrick, Plaintiff's compensation was solely based on commissions from sales of motor vehicles.

48. Shortly following Plaintiff's report, Mr. Sampat did not train, mentor, or otherwise assist Plaintiff in her Sales Consultant position.

49. Most importantly, Mr. Sampat did not train, mentor, or otherwise assist Plaintiff in regard to achieving sales and commissions.

50. In fact, Mr. Sampat took actions to create obstacles and increase the difficulty for Plaintiff to achieve sales and commissions.

51. For example, when Plaintiff was close to finishing sales of motor vehicles, management substantially decreased the sale prices of the motor vehicles and, in turn, decreased Plaintiff's commissions.

52. Another example is that Mr. Sampat manipulated the numbers from the division of Hendrick's portion of the sales of motor vehicles so that Plaintiff's commissions were decreased.

53. Another example is that Plaintiff was frequently assigned to go outside on the lot to greet customers, unlike many of her Sales Consultant co-workers who were not frequently assigned to go outside on the lot and greet customers.

54. In or about February 2021, Plaintiff became engaged to be married.

55. The custom in Kuwait is to not date before getting engaged.

56. Plaintiff and her fiancé did not date before they got engaged.

57. Plaintiff's co-workers made many jokes about Plaintiff not dating her fiancé before they got engaged.

58. In or about March 2021, Plaintiff got married.

59. In or about May 2021, Mr. Karras offered Plaintiff a Finance Manager position, which she accepted.

60. Mr. Karras arranged for Plaintiff to attend training courses regarding finance.

61. Mr. Karras told Plaintiff that she was going to be placed on a guaranteed pay plan of $3,000 per month for three months until she gained some experience in the Finance position.

62. Mr. Karras instructed Plaintiff not to tell anyone about this opportunity in Finance and, if asked, to tell her co-workers that she was on vacation.

63. A finance training course instructor told Mr. Karras that Plaintiff was the first person he had ever given 5s to in each are of the delivery of her presentation.

64. In or about June 2021, Plaintiff officially started in her Finance Manager position.

65. Plaintiff was rarely provided with an opportunity to work on a financing transaction.

66. Mr. Karras frequently instructed Plaintiff and her co-workers at Hendrick Lexus to not keep the customers waiting very long in the business office.

67. Plaintiff was assigned to work on cash transactions with clients who had already been interviewed by other Finance Managers and it had been confirmed that the clients no intention or ability to purchase motor vehicles or warranties.

68. Other finance managers took actions that directly or indirectly made Plaintiff's job more difficult or caused her performance to suffer.

69. For instance, other Finance Managers changed the financing rate she had obtained from creditors.

70. Other Finance Managers modified contracts that Plaintiff had prepared without informing her.

71. Other Finance Managers lost checks that Plaintiff collected from clients.

72. Other Finance Managers met with clients, instructed them to wait for long period of time (sometimes hours), and then asked Plaintiff to assist said clients when they were frustrated.

73. Sales Managers and/or Sales Consultants sent customers home and told them to come back later when other Finance Managers were busy, but Plaintiff was not busy and available.

74. Sales Managers, Sales Consultants, and/or other Finance Managers arranged for customers to wait for other Finance Managers when Plaintiff was available and ready to assist them.

75. Upon information and belief, male and female co-workers at Hendrick Lexus developed sexual relationships.

76. In or about summer 2021, Plaintiff had a conversation with Mr. Karras about the difficulties she was experiencing with some of the managers and her co-workers and socializing with them outside of work.

77. Plaintiff told Mr. Karras that it seemed like in order to fit in with some of her managers and co-workers, she had to go out with them to bars.

78. Plaintiff also told Mr. Karras that her co-worker Dan Cundiff had previously given her the advice of not socializing with her co-workers outside of work because they just drink a lot and have sex with each other.

79. Mr. Karras told Plaintiff that Dan gave her terrible advice.

80. Mr. Karras also told Plaintiff that relationships are very important in the business and she has to work on building relationships with her co-workers.

81. Plaintiff indicated to Mr. Karras that she believed that some of her co-workers had a sexual relationship, that she is married, and that she does not wish to put herself in a position where male co-workers may attempt to make sexual advances towards her.

82. In or about August 2021, Sales Manager, Brandon Ryan had a couple of motor vehicle purchases that were ready for Finance Managers to assist with.

83. At this time, all of the other Finance Managers were busy assisting other clients and Plaintiff was available.

84. Plaintiff approached Mr. Ryan and requested to assist with one of the motor vehicle purchases.

85. Mr. Ryan ripped the documents from Plaintiff's hands, put them in his desk drawer, and yelled, "Go check with your fucking manager! Get the hell out!"

86. Other Sales Managers and Sales Consultants saw and/or heard Mr. Ryan's outburst at Plaintiff.

87. Shortly following this incident, Plaintiff reported Mr. Ryan's inappropriate outburst to Mr. Karras.

88. In or about September 2021, Plaintiff was demoted to a Sales position.

89. Upon her return to a Sales position, Plaintiff's database of clients/customers was not there – it had been removed and/or taken.

90. From in or about September 2021 to in or about November 2021, Plaintiff struggled to obtain sales and commissions because of comments directed towards her and actions taken against her by co-workers.

91. For example, when Plaintiff was sitting at the front desk with her Guest Services co-worker greeting customers who walked in, she received a text from Sales Manager, Brandon Burton telling her to stand up, she can't sit there, and Anthony (another manager) saw her and he doesn't want her to sit there.

92. Other Sales employees sat at the front desk and were not chastised for doing so.

93. In or about September 2021, Plaintiff was working with Sales Manager, Terry Foglesong on a sale of a motor vehicle.

94. Plaintiff collected the required documentation from the client (i.e., copies of identification records, trade registration, payoff information, etc.).

95. Plaintiff set up an appointment for the customer to return to Hendrick Lexus within about three hours and sign the sale agreement and take possession of the motor vehicle.

96. Upon the customer's arrival for their appointment, Mr. Foglesong told Plaintiff that the documentation that she had collected had been misplaced and instructed her to collect all of the required documentation again.

97. Plaintiff asked Mr. Foglesong to look again for the required documentation, explaining that informing a customer that the dealership had misplaced important documents would probably make her and the dealership appear to be unreliable.

98. Mr. Foglesong instructed Plaintiff to go home for the day and threatened her by telling her he would report her.

99. On or about September 30, 2021, Plaintiff purchased a motor vehicle from Hendrick Lexus.

100. Hendrick Lexus allegedly misplaced Plaintiff's credit application, other credit documentation, and/or the sales agreement and asked her to sign the sales agreement multiple times, resulting in the delay of Plaintiff's receipt of the check for her trade in car.

101. Due to Hendrick Lexus' alleged misplacement of Plaintiff's credit application, other credit documentation, and/or sales agreement, Plaintiff's credit was pulled approximately four times and her credit score decreased.

102. To Plaintiff's knowledge, Hendrick Lexus never misplaced any other customer's credit application, other credit documentation, and/or sales agreement.

103. Because of stress and anxiety, Plaintiff began seeing a therapist.

104. Plaintiff's therapist advised her to request some time off from work.

105. Plaintiff applied for FMLA, which was granted, and it was to begin on November 16, 2021.

106. On or about November 11, 2021, Plaintiff was not scheduled to work that day but came into work to assist a customer and close out the sale of a motor vehicle because that was a more convenient time for said customer.

107. This particular customer had already tested the vehicle and agreed to purchase it; he was only coming in to close out the purchase, sign the contract, and take possession of the motor vehicle.

108. When Plaintiff arrived at Hendrick Lexus, she saw one of the other Sales Consultants or a Sales Manager assisting her customer.

109. Plaintiff went to Terrance and told him that this was her customer and she would assist him.

110. Terrance told Plaintiff that he was still going to assist this customer and told her to go talk to Mr. Foglesong.

111. Plaintiff went to Mr. Foglesong and told him that Terrance was attempting to poach her customer and her commission.

112. Mr. Foglesong told Plaintiff that was okay, and she could split the deal with Terrance.

113. Plaintiff asked Mr. Foglesong why was that okay and said that this was her deal, she had done all of the work on it, and that she was there for an appointment on her day off to close it out.

114. Terrance walked in the Sales Manager office.

115. Plaintiff again asked Mr. Foglesong why was that okay.

116. Terrance snapped at Plaintiff in front of Sales Managers and other Sales Consultants and said, "Get the fuck out of here, you are a troublemaker!"

117. Plaintiff asked Mr. Foglesong and Mr. Sampat if they heard Terrance's inappropriate remark towards her.

118. Mr. Foglesong and Mr. Sampat were silent.

119. Due to the incident, Plaintiff began her FMLA leave on or about November 11, 2021.

120. Plaintiff immediately reported the incident to Human Resources and notified them that she was starting her FMLA leave on November 11, 2021.

121. Mr. Ryan told Plaintiff that she was permitted to start her FMLA leave on November 11, 2021.

122. In or about December 2021, Plaintiff's sales and commissions and, in turn, her income from Hendrick was so minimal that she was not able to pay her rent, and she was forced to withdraw from her 401k.

123. Defendants' comments and/or conduct based on sex, national origin, race, and/or religion resulted in working conditions that were so intolerable that a reasonable employee would feel forced to resign.

124. Defendants intended to force Plaintiff to resign or reasonably foresaw or should have foreseen that its comments and/or conduct based on sex, national origin, race, and/or religion would force Plaintiff to resign.

125. Plaintiff resigned from her employment at Defendants due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

126. Prior to her resignation, Plaintiff received praise regarding her performance at Hendrick on many occasions.

127. Hendrick's acts of discrimination, harassment, and retaliation against Plaintiff comprise a series of interrelated events which constitute a continuing violation.

## COUNT I
**Title VII – Discrimination, Hostile Work Environment, & Retaliation**

128. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

129. Plaintiff is a member of a legally protected class due to her sex, national origin, race, and/or religion.

130. Plaintiff was subjected to the above referenced adverse actions and/or omissions because of her sex, national origin, race, and/or religion.

131. The above-referenced discrimination affected the terms, conditions, and/or privileges of Plaintiff's employment.

132. The above-referenced discrimination, harassment, and retaliation toward Plaintiff was because of Plaintiff's sex, national origin, race, and/or religion.

133. Plaintiff's male, American-born, Caucasian, and/or non-Muslim co-workers were treated more favorably than her.

134. Plaintiff's male, American-born, Caucasian, and/or non-Muslim co-workers were not subjected to the same or similar unwelcome comments or conduct.

135. Plaintiff engaged in the protected activity of opposing and/or complaining of discrimination and harassment to Defendants on multiple occasions.

136. Defendants knew of the above-referenced discrimination, harassment, and retaliation toward Plaintiff and failed to exercise reasonable care to prevent and promptly correct said conduct.

137. Defendants failed to make a good-faith effort to establish and enforce policies to prevent illegal discrimination, harassment, and retaliation.

138. Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under Title VII.

139. Plaintiff was subjected to the above-referenced adverse actions and omissions because of her opposition of and/or complaint regarding discrimination to Defendants.

140. As a direct and proximate result of Defendants' unlawful conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

141. As a direct and proximate result of Defendants unlawful conduct described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to,

embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

142. Defendants conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendants for such damages as are fair and reasonable, including compensatory damages, punitive damages, pre- and post-judgment interest, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

## COUNT II
### KAAD – Discrimination, Hostile Work Environment, & Retaliation

143. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

144. Plaintiff is a member of a legally protected class due to her sex, national origin, race, and/or religion.

145. Plaintiff was subjected to the above-referenced adverse actions and/or omissions by Defendants because of her sex, national origin, race, and/or religion.

146. Plaintiff's male, American-born, Caucasian, and/or non-Muslim co-workers were treated more favorably than her.

147. Plaintiff's male, American-born, Caucasian, and/or non-Muslim co-workers were not subjected to the same or similar unwelcome comments or conduct.

148. The above-referenced discrimination affected the terms, conditions, and/or privileges of Plaintiff's employment.

149. Defendants knew of the sex, national origin, race, and/or religion discrimination toward Plaintiff and failed to exercise reasonable care to prevent and promptly correct said conduct.

150. Defendants failed to make a good-faith effort to establish and enforce policies to prevent illegal sex, national origin, race, and/or religion discrimination.

151. Defendants failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under the KAAD.

152. As a direct and proximate result of Defendants' unlawful conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

153. As a direct and proximate result of Defendants' unlawful conduct described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to, embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

154. Defendants' conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendants for such damages as are fair and reasonable, including compensatory damages, punitive damages, pre- and post-judgment interest, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

**JURY TRIAL DEMAND**

PLAINTIFF REQUESTS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

        **Murphy, Kinney, & Sumy, LLC**

        /s/ *Kyle E. Murphy*
        Kyle E. Murphy #78836
        Gunner Sumy #28409
        406 W. 34th St., Suite 816
        Kansas City, Missouri 64111
        Phone: (816) 281-5470
        Facsimile: (816) 866-7772
        kyle@murphykinney.com
        gunner@murphykinney.com
        ATTORNEYS FOR PLAINTIFF